Good morning, Your Honor. My name is Cynthia Kagiwara and I'm representing Defendant Appellant William Notyce. I'd like to reserve two minutes for rebuttal, if I could. Your Honors, we are here today to decide one matter, whether or not there was probable cause to arrest Mr. Notyce when Officers Curry and Echiberry first saw him in the parking garage of Keolani Manor on August 5th. It's a totality of the circumstances test and because this was a warrantless arrest, the government has a burden of proof of meeting that exception. In this particular case, timing is everything. And what I mean by that is there were several things that the various law enforcement officers learned after Mr. Notyce's arrest, but what they knew up until the time they saw him in the parking garage, that's what's key to this case. So, unfortunately for your client, he wasn't unfamiliar to the law enforcement, correct? He had been identified for, they did have some knowledge about a prior drug situation involved with him, is that correct? Your Honor, I'm not exactly sure which situation you're referring to. There was a situation where after Mr. Notyce's arrest, one of the law enforcement officers discovered that he had been involved supposedly in drug trafficking back in 2011. My understanding is just two months before the incident here, law enforcement attempted a controlled delivery of methamphetamine to Notyce because they suspected a parcel with During that investigation, they confirmed that Notyce received packages addressed to the names of others than his own. So I'm not exactly sure, are you referring to what was written in Mr. Officer Correa's report? When they stopped him, they stopped him, guns blazing, correct? Correct. But if, in the district court, I believe said they didn't have probable cause to arrest, but went beyond the Terry search, and then, but said there was inevitable discovery about the case and other things, but if we found that based on all the information they had at that time, there was probable cause to arrest, do you lose? Yes. Okay. And what, so it's the totality of the circumstances, what the officers knew at the time they pulled him over with and pulled him out with guns, right? Correct. And they did not know about any of his, any other previous. Well, but didn't, didn't they know at the time that he had been at the post office, that he was associated with the P.O. Box, he was present at the location where officers knew that this parcel that had been, I guess, misaddressed or addressed to somebody else had been taken. I mean, why isn't that, why isn't that a fact? And they knew it had been opened, too, by there was something that notified him it had been opened, too, right? Correct. There was a beeper warrant installed in the package, and that beeper warrant went off. So why doesn't that all add up to probable cause? Well, for, if I could just backtrack a minute, they only were able to confirm later that it was Mr. Notiz who went to the post office the day before. Well, but I thought that they, that they had observed a car known to be his car driving by the post office at the, at the time that the post office box was opened. Was that something they only learned later, or was that known? Well, that's a little bit in dispute. Well, but we have to take the facts in the light most favorable to the government, yes? That's correct. So they knew, they knew that a car had come to the post office after they had put the slip in the, in the post office box. They knew the person, the person who left that car was the only person in the office at the time, post office. At the time, they, they knew that person had gone to the box, looked at the note, put the note back in, and that they knew it a day later. Somebody else came, somebody came to pick up the package. They saw the same car as they were tracking the package to the, to the, to its location where it was opened. And they observed the same car entering the parking garage that they had seen at the post office. Didn't they? No, that's not correct, Your Honor. They did not see, so the car that went into Capiolani Manor was a purple Scion. Mr. Notiz was associated with a BMW. The car that was driven to the post office on the day that the person opened the box and took out the slip of paper was what kind of car? It was a little confusing. So on the day that the package was taken out... I feel like we're dealing with an alternate world of facts here. I feel like I have some idea of the facts, and you're saying those aren't the facts. Mr. Notiz's car was not the car that picked up the package on August 5th. Not the one that picked up the package. What car was seen coming to the post office on the day that somebody put their hand in the post office box, looked at the note about where the package was, and then, and then the... There was a BMW coming on August 4th, which was the day before. However, in his affidavit, Mr. Etchibary, Officer Etchibary, who was the person who said he observed the BMW, in his affidavit on August 5th, he said that they only later learned that it was William Notiz. They saw the BMW, he said that units saw the BMW, but they only later learned that it was Mr. Notiz. Later before the stop, or later after that day? It was a little unclear. Yeah, see, I thought that they had learned before the stop in the parking garage that this was Mr. Notiz's car. There's some evidence in the record of that, is there not? There is some record where, again, they said... So we have to take that record into light and what's favorable to the government. So at the time they stopped him, they know he's, they have good reason to think he's the person who went to the post office that day and looked in the box to find that there was a note that said the package was at the counter. We know that package is retrieved the next day and taken to this apartment and opened, and we know that the person that they reasonably believed was at the post office on the day that the note was placed in the box and reviewed it is now in the garage at that place. Is that enough for reasonable suspicion? It may be enough for reasonable suspicion, but reasonable suspicion is not probable cause. Okay, so why, so if it is, why isn't it enough for probable cause? Well, first of all, going back to the day before, the record shows that they only were able to confirm that was Mr. Notiz, and he was the only person in the lobby after Mr. Notiz was arrested. U.S. Postal Inspector Rodriguez went back to the post office after Mr. Notiz's arrest, and only then did he view the video and see it was Mr. Notiz and see that there was nobody else in the lobby. Right, but I think the import of our questions has been that they didn't need the video because they already knew that the BMW that they saw on the day that somebody opened the P.O. box and looked at the slip was identified with Mr. Notiz. So, I mean, why is the video even necessary here? I don't think it was. Well, number one, on the day that the parcel was picked up, it's unclear that they saw Mr. Notiz's BMW until after he was arrested, when they first stopped him in the parking garage. The car that picked up the parcel was driven by Mr. Matsuda. I'm talking about the car that was at the post office before the P.O. box was opened and Rodriguez observed, you know, someone's hand reaching into it, not the parcel pickup. Well, even if it was Mr. Notiz's car, there was nothing to connect him with the package or that he had knowledge of what was in the package. Can I ask you about inevitable discovery? You concede they had reasonable suspicion to stop him? I would concede that they had. I think you have to. Yes. He's got on his hands the powder that shows that he's opened the package. Are they entitled to look at his hands with the ultraviolet light after they've stopped him for reasonable suspicion? That is an open question. However, I think the problem here... Close it for me. Okay. If they are... I would say no. If they are... I would say no. I would say no at that point because they know he's opened the package with the drugs in it. So tell me why they're not, in your view, why they're not entitled to look at his hands. I would agree that they had probable cause at that point. Problem is they did not have probable cause when they first stopped him. Well, but you don't have... See, they stopped him on reasonable suspicion. They could have developed probable cause as part of a Terry stop. And so my question is, why didn't they develop probable cause when they shone a light on his hands and saw that the powder was on it? They could, but that's not what they did. They arrested him. They came at him with guns drawn. They took him down. They handcuffed him. He couldn't move. That's an illegal arrest. And so everything that followed that... Well, that's fairly. If you make a high-risk stop, at some point it would become an arrest. But if every time the officers pulled people over at gunpoint based on if they were in that doesn't automatically become an arrest. They can make a high-risk stop. That's correct, Your Honor, but in this case there was no high risk. You're already in overtime. Why don't we... Okay. Why don't we wait? I'll still give you two minutes for rebuttal, okay? Thank you. Good morning. Good morning. May it please the court. My name is Michael Albanese. I represent the United States. Okay, Mr. Albanese, you can sort of jump right in because we seem to be having a different... There seems to be difference in what the facts were. Why don't you give us the government's perspective of what the officers knew when they pulled him over, when they made a high-risk stop, and what information did they have? Absolutely, Your Honor. So what we know is that when the parcel was seized initially in the application process for the initial search warrant, Postal Inspector Rodrigues did some database searching and came up with the name of William Notiz as associated with an earlier parcel that had been seized and found to contain methamphetamine, and that's contained in the report of Officer did have access to and could rely on. So we know that. We also know from that report that there was a pre-operational briefing prior to the controlled delivery on August 4th at which the person of William Notiz and the car were discussed, and we know that from the direct testimony of Officer Kyle Echeverry. Back up for me for a second because I'm still trying to get the facts about what they knew straight in my mind. They knew when they obtained the warrant that Notiz had come to their attention before. On the day that somebody came to the post office and looked in the box, I'm trying to figure out what they knew that day. They knew a car had been driven up. They may not have viewed the tape, but they knew from post office people that nobody else was there. What did they know about who was driving that car and when did they learn that? So not only that a black BMW was driven up, but that was a black BMW that they were clued in on based on a prior pre-operational meeting. When you say they were clued in on, that's nice, but tell me what they knew about it. They knew that essentially that one of the universe of target suspects was William Notiz and he was associated with this particular black BMW. So they knew before that black BMW arrived that he was associated with the BMW? Was it registered to him? I don't know how one associates with a car. Right. The direct testimony of Kyle Echeverry, an officer at Echeverry on that point, is not crystal clear. The reality is it was a registered car to him, but the record is not as clear as it should be. But at least they thought he was associated. It turns out it was registered to him. Right. And that car arrives. That car arrives. That person comes and leaves. We know all about that. And the timing is, and Kyle, Officer Echeverry testifies that the timing is one, two, three. Black BMW arrives. They can't see the driver at that moment. Somebody walks in. Inspector Rodriguez radios that a person checked the box. Person walks out. And then as the black BMW is leaving, Officer Echeverry testified that at that point he was able to make an identification of Officer Notiz. Mr. Notiz. Mr. Notiz. Yeah. We're just having all sorts of trouble, but yeah. I believe I am, yeah. And so at that. So at, on that day, they have, you can add up all these facts however you want. They believe Mr. Notiz is the person who has accessed the post office box. Correct? Absolutely, Your Honor. Both because it's their car and because an officer identifies him as he's leaving. That's correct. Okay. Now, the day the package is picked up, we just don't know who picked it up, correct? So we know, well, another individual who was a co-defendant named Keith Matsuda picked up the parcel, immediately handed off to a unidentified individual who then immediately handed it off to the other co-defendant, Mr. Yanagi Hara. Do the officers have any advance information that any of the people in this chain of handing off are associated with Mr. Notiz? No, they didn't know that, but they are obviously. They have no more information about Mr. Notiz that day than they did the day before. That's correct. Until they saw him at the address that that parcel eventually went to, when they saw him later, moments after the parcel had been opened, that sort of confirmed. That's what they knew at the time. So tell me why that adds up to probable cause. Well, simply put, there's no innocent explanation for the behavior on the previous day of going to a post office, checking to see that the slip is there, and placing it back without retrieving the parcel. The only logical explanation, which is the one that the district court came to, was that one does that to distance themselves from the contents of the parcel, and because we know that, in this case, the contents were two kilograms of methamphetamine, it then makes sense. But don't we... Okay. But they also know that they had already taken the methamphetamine out, put fake stuff, and they had a beeper in there, and they had searchy in there, right? That's correct. So that's what you all do on these situations. That's correct. You don't let them keep the methamphetamine, and so the officers know that. That's correct. That's part of standard procedure. That's right. But the fact that, obviously, Mr. Notiz didn't know that, and so he checks the box without picking up the parcel, which is suspicious in its own right. Then the fact that he is exiting Kapi'olani Manor six or seven minutes after the officers had been alerted that the box had been opened, and has stipulated the parties, he was walking... I thought that the officers that are watching this post office box, when they associate the car with Mr. Notiz, I thought they knew of this prior incident where he was, that he wasn't a person, that he was a person that was known in the drug trafficking business. Yes. So there are two, there are actually two prior incidents. The one... When do they know them? Do they know them before they stop them at gunpoint? So I believe the officer Correa's report makes clear that they were aware of the more recent previous parcel that was addressed to somebody named Pedro Ruddy that contained methamphetamine, and the PO box in that case associated, through postal database checks, and that's unfortunately all we know about what that means, to William Notiz, putting him on the radar for this box. There was also an... That same box, that same PO box that was... It was a... So there was an earlier investigation to a different PO box, registered to a different person, but through postal database checks. Connected to Mr. Notiz. Right. So that's what they... We know that they knew that at the time of the stop. There was a 2011 postal inspection investigation that also identified Notiz. The record is unclear whether they knew that before the stop, or whether they came to that information earlier. I think the affidavit of Officer Caneo is a little bit unclear on that point. I would submit it's logical that the inspector would be doing a search of all of the prior times that this person's name came up, but again, the record... You don't know, right. I want to... Can you focus for me on the day of the stop? They know the package has come to this location, because it has a beeper in it. Yes. And they confront Mr. Notiz in the garage. Do they know whether he's coming or going? I believe the stipulation of the parties at the time of the suppression warrant was that he was walking towards his black BMW. He was walking towards... Am I right that they had seen the black BMW enter the garage there, or am I mistaken about that? That, I believe you're mistaken. It was there. The black BMW was there, but we don't know how he arrived, or do we? We do not, Your Honor. The car that brought the package from the Manoa post office to the... That was the car identified by your friend? Absolutely. That's right, but we don't know how Mr... For all we know, he may not have arrived during that time period. He may have already been there, is all we can tell from the record. That's correct. But his black BMW was in the garage, and he was walking towards it when being apprehended. That's correct. Thank you. So that fact, again, coupled with the timing, that it's minutes after the box had been opened, I think the officers drew a logical inference, and so did the district court, that he's walking away from... And the parcel had been opened. The parcel had been opened. Right. Right, the parcel had been opened. Right. They don't know about the search utilities out of the vehicle. That's correct, Your Honor, until they... So is looking for search a search? No, Your Honor, and that's what we argued to the district court. In other words, if you had stopped somebody on reasonable suspicion on the street, could you put the ultraviolet on his hands and see? Yes, Your Honor, as long as you don't exceed what you'd normally be able to do based on just reasonable suspicion. Well, that's why I'm asking you, did you have a case that supports that proposition? I do not at the tips of my fingers. In this case, because of what the officers did, although there are cases which say that gunpoint isn't dispositive, ordering someone to the ground isn't dispositive. Well, it doesn't matter if there was probable cause because then they could have arrested him in any event. I'm asking a different question, which is if there was only reasonable suspicion and they took a few minutes later and put the ultraviolet on his hands, would that have been an illegal search? And because the district court did evaluate whether or not the searchee powder itself was a search and concluded no, I would agree with that. Because at that point they would have had probable cause. That's right. So they don't have a warrant at this point, right? The warrant that they get is later for the residence, correct? For the apartment that turned out to be the drug stash house. Right. So the warrant that we're talking about, so when they notice at the time he's going towards the vehicle, does he actually get in the vehicle? No, I don't believe that that's… So they just take him down? That's correct. He eats the cement, gets cuffed, they pretty much don't fool around, he's cuffed. He's ordered to the ground, he complies, and then once on the ground he's cuffed and then they immediately go into his pockets. So that's what's in the record here. The key that they find is not associated with the – is it associated with the apartment that has the drugs or is it associated with the other apartment? So the keys, they find what they call a fob that opens the garage to that apartment, to Capilani Manor. They find the keys that open the door to the drug stash house, and those were critical pieces of evidence that were presented by the United States in trial in this case. So if the district court found that they exceeded the Terry stop, but if – I'm just wondering, I mean if you want to make sure someone doesn't have any weapons after you've taken them down, the keys are hard, right? And to be clear, the district court did not explicitly say that they exceeded the Terry stop, except for searching – I see what you're saying, I apologize. Let me back up. The district court found that they had probable cause to make the stop, but then still evaluating it under the Terry stop analysis, found that because the keys themselves were not obviously criminal or evidentiary in nature, that that portion exceeded – seizure of the keys and the fob exceeded the Terry stop, but was later found to be – would have been inevitably discovered. The money was appropriately seized as evidence during the search of the Terry stop. What I'm arguing is that what the court didn't consider is that this is essentially – it's a search incident to lawful arrest because they had PC, and a search incident to lawful arrest can precede, as long as it's very close, the actual moment that the officers would say, I'm executing the arrest at this point, because they had probable cause prior to doing anything with Mr. Notiz at the time he was encountered. So at what point do you say he was under arrest? I would say that the – what we have not argued in our brief is that – withdrawn. I would say at the level of force that they used under these circumstances was as close to, if not the level that would be consistent with an arrest, and so for purposes of this argument, he was arrested at the moment they encountered him. You kind of don't feel like you can go anywhere much when you're on the ground handcuffed at gunpoint, right? And immediately – yes, exactly. Immediately cuffed, ordered to the ground at gunpoint, and then searched again immediately. It's close enough to arrest, and because there's ample evidence of probable cause prior to that point, that's the position of the United States in this case. So we've gone over – I have a question. Thank you. So that'll conclude your time. Thank you. Thank you. Your Honor, if I could answer your last question first. This was not a high-risk stop. Mr. Notiz had no prior history of weapons. They had no evidence that he was armed. They had nothing to show that this was high risk. So this distinguished this case from some of the other cases where they – I think police officers sometimes think that drug dealers have guns. But they had no knowledge. No. So I think this distinguishes it from these cases where there's known violence about the defendant or they knew in advance that the defendant possessed a weapon. But I think what we're here for here is if taking him down –  you know, if all of those – they took him at gunpoint. They cuffed him immediately. They searched him to make sure there weren't weapons or whatever. He's under arrest. So they're saying he's under arrest at that point. So our decision then was there probable cause to arrest him at that point. If there wasn't, then your case becomes better. If there was, I think your case becomes worse. I would agree with that, Your Honor. But I would say that there was not probable cause, and I wanted to come back to what was actually presented at the suppression hearing to summarize kind of what the government presented as what everybody knew. I guess I'm just going to have to tell you I read the record the way that they did. So I was totally confused when you started saying they didn't know any of those things. Well, first of all, the one incident that Mr. Albanese referred to was first written about in Officer Canijo's search warrant affidavit for the residents, and she said further checks revealed this earlier case from 2011. So they didn't look for that until after Mr. Notiz was arrested. This was five days later. So that's that one. The second one, this kind of cagey thing about somebody else having a post office box that was maybe associated with Mr. Notiz, that was never mentioned at the suppression hearing. That was not a basis for their argument, and that was first mentioned in Officer Correa's summary report, which was written on September 8, 2016. Was the report in evidence at the hearing? I'm sorry? Was the report in evidence at the suppression hearing? It was, Your Honor. So it was mentioned? It was not mentioned. They didn't put on a witness to talk about it, but they put on evidence about it. Well, and it was actually a defense exhibit. But, yeah, it was submitted. But the government never asked any questions about that. That was never a basis in their affidavit for the search warrant of the apartment. But this is all de novo for us. So we look at what was in the record. We make the legal determinations de novo. So we're just trying to get our arms around what was in the record. So we're going into overtime again. So unless my colleagues have any questions, sum it up in 30 seconds. Your Honor, I would argue that there was no probable cause to arrest Mr. Notiz when they first saw him in the parking garage of Capiolani Manor, and everything after that should be suppressed as fruits of the illegal arrest. Thank you. Thank you both for your argument. This matter will stand submitted.
judges: CALLAHAN, HURWITZ, THOMAS